Case 13-2342, Young v. CHS Middle East. It pleases the court. Scott Oswald on behalf of the plaintiffs in this case. If the court would allow me to make three initial points to the court. First, although the Youngs need only meet the reasonable good-faith standard in order to make out protected activity under the statute in the wake of Triple Canopy, it's very clear that they were right about their concerns that they raised. They don't need to be right, but in light of this court's decision in Triple Canopy just several weeks ago, we contend that they are in fact correct in their concerns. Second, although the statute in using the terms like fraud, illegality, and legal liability, the Youngs met the standards that set out in Eberhardt and in its progeny. They have placed the defendant on notice of a distinct possibility of a False Claims Act claim. They would also meet the new standard that the Congress has set out, the effort to stop one or more false claim as well. Finally, the Youngs are only required in this complaint to meet an 8A standard, not to meet a 9B standard, which Triple Canopy, some of the accounts were dismissed on because they hadn't met that higher standard. Here, we are under simply a lower standard of 8A. This is a case where the Youngs themselves, in their disclosures to both their supervisors and ultimately to the Department of State, disclosed the fact that the defendant, in this case, was billing the United States for individual surgical techs who did not have the appropriate certifications in field. These were EMTs, very different type of individual with different requirements. Certified surgical technicians require a one or two year post high school training program. They require course work in medical terminology, physiology, bacteriology, and in sterilization methods in the surgical room. They also require a certification exam and 60 hours of medical certification training over a four year period of time. What the company was supplying those operating rooms was an EMT, very similar to someone who might treat you on the street, as an example. These do not require any kind of college education. It's a three week course and CPR certification. That's all that's required for the people that were showing up in the surgical room, handing the implements to the surgeons, making sure that things were sterilized. They didn't have the training and that is precisely what it is that Mr. and Mrs. Young were complaining about in paragraph 48, in particular, in the complaint that was filed in this case. What they said in that paragraph was that the company in not, in sending reports, false employee staffing reports to the Department of State, that it was opening up the defendant to potential liability. Also, they used the term fraud on the government. This is on the 15th of December of 2011. Then shortly thereafter, just literally days thereafter, they were relieved of their duties and they were terminated after they made this disclosure. The defendant instructed them not to have any communications at all with employees. This all was known to the defendant. They knew precisely what it was the Youngs were complaining about. And under the circumstances, through the lens of Triple Canopy, what it was they were complaining about was, in fact, a false claim. Why? Because what they were saying, as in Triple Canopy, was that the individuals that you are providing in this surgical room do not have the certifications that the contract requires. The contract pled in the complaint requires that individuals be certified in these positions. The complaint itself- The billing requirement under the False Claims Act that you have to allege that they billed, or at least for these allegedly fraudulent services? Well, there were staffing reports that were sent to the State Department. That's in paragraph number 48 of the complaint itself. This was a $65 million contract, fixed-price contract, just as the contract was in the Triple Canopy case. Those reports constitute billings? Yes, because these bills, the State Department did not hand over $65 million to the contractor and say, please proceed. These were periodic payments that the State Department made in this case. That's plausible under the circumstance, under the standard that we have to meet here. The reports that they talk about in 48, where they were certifying that individuals in this surgical room had the necessary certifications, was false. The individuals were not certified, and this mattered. Why did it matter? Because, as in Triple Canopy, where we had guards that couldn't shoot straight- Let me understand this paragraph where you say reports were sent to the State Department. Do you not have to also say reports were sent, bills that were paid for the fraudulent services, or you just say they just sent reports? Well, the issue is whether it's plausible. What happened here is what's required and now under the standard is, and the Triple Canopy clearly sets it out, the standard for falsity no longer is a stringent one. What's required is that there is some kind of statement in a report that is submitted to the government itself that is false. And that's precisely what it was that the young said. The Triple Canopy at page six says the following. What is required is that there was a provision of services that were reported to the government that had objective requirements. That's what we have here. We have surgical- Is it required that payment had been made for those services? Yes, that's precise. That's what the contract- Is it required that you allege that? No, it is not. And the reason is we- You don't have to allege that there had been payment for it, only that a report. So you actually could have a report that's been submitted, but there's no payment. Well, that's a good question. Again, this goes right to the complaint. The complaint states that the contract itself requires that individuals who are provided in these positions have the appropriate certifications before they leave the United States and in-country. These are periodic reports that are sent to the State Department to confirm- I just want to make sure I understand. You acknowledge your complaint does not allege payment for those services, but you say that's not required. But you acknowledge it does not allege that. No, we allege that there were payments for the services. That's precisely in the complaint itself. The $65 million was for these services. That's what it was the State Department was paying for. It was paying for personnel. Paying for personnel to be in these positions, to have the appropriate certifications, and we know that because it's alleged in the complaint. So specifically, the State Department relied upon- All $65 billion? Yes. So, make sure I understand. So, someone has a $65 million contract, and then part of that contract they do something that they shouldn't be doing, which is a false claim. You don't have to allege that they were billed for that particular part? You just say they were paid $65 million? Well, if this were a 9B standard- Is that true? In an 8A- All I need to know is the truth. If it's true, then we'll move on. All you need to do is just say $65 million was paid. If it's plausible that the payments under the contract- That a part of those payments- Yes. Were fraudulent, then you can just allege the whole amount has been paid fraudulent claims. What we're saying is that there were periodic reports sent to the State Department, and the State Department paid the contractor over the course of the contract for those services. The whole services? Yes. And every last one of them were fraudulent? No. That was all I was asking. I'm sorry. I was only asking just- I apologize. I didn't understand the court's question. You don't have to allege that they received fraudulent payments specifically for those fraudulent services. You're saying just say, well, they paid them $65 million. And in the course of that $65 million, there were some reports sent that were false. That's sufficient. The issue is really it gets to materiality. It does not go to whether it's false. And the court in its teaching in Triple Canopy says exactly that. The court meant to shift the burden to scienter and materiality. And materiality is defined as any provision in the contract that is likely to influence payment or could influence payment. In this case, what it was that the contractor agreed was to provide doctors that had licenses, surgeons to take care of wounded in the battlefield, people in the surgery room. That's why our clients were surgical nurses. They were put in the surgery room to perform that surgery. They had to have those certifications. And individuals in those positions that were qualified and trained, it's a specific requirement of the contract. It's alleged in the complaint itself. This is in the provisions of the complaint which talk about the requirements of the contract itself. These are outlined as specific requirements for the defendant which they did not meet. And under the court's teaching in Triple Canopy, all that is required under the circumstances is that in fact, there was this, that it was, something was false, transmitted to the State Department, and it may have had influenced a claim. But remember that we don't have to be right. All that is required under the statute is that there is a reasonable good faith basis. We know that because man teaches us that. You don't have to be right. All that you have to have is a reasonable good faith belief. And what we have here in this case is a very thorough investigation by our clients from the time they went in country. Complaints initially at the lowest level, moving up the chain of command when they weren't getting responses. Finally complaining to the State Department. And then two days later, they're fired. So this was not something that was, was whimsical. It was something that they had, they had researched, that they had disclosed to the individuals in country, up to the highest level, Ms. Cox, who was their international director. Can we go back to Triple Canopy for a moment? Yes. And you, I'm sure, have read and re-read it. But you remember footnote four, where the court distinguishes earlier cases, false claims act cases, where there had been what we characterized as garden variety breaches of contract. Yes. So how do we distinguish this case from those garden variety breach of contract cases? When we know that one of the distinctions, the first distinction that the Triple Canopy Court made, which was the government has clearly expressed its displeasure, is not a factor here. We don't have the government joining the action here. Yes. As, as you did in Triple Canopy. Yes, that's right. So how do we distinguish this case from those garden variety contract cases? Well, I think it, it really goes to the, the, the teachings of Triple Canopy at page number four. And the requirements are that one, that there's a withholding of information about its non-compliance with a material contract requirement, and whether through the act of submitting a claim, the payee knowingly and falsely implied that it was entitled to payment. In this case, we have an objective requirement, and that was what was at issue in Triple Canopy. That these individuals were certified in marksmanship. In this case, certified in the operating room. Again, what we're talking about is handing the right- A little more than that in Triple Canopy, wasn't it? Not just that they were certified, but maybe you can argue this, that they actually falsified their tests on the scorecards. In other words, they didn't just say, well, you know, we're supplying you marks, marks persons, or sharpshooters. That would be your case here. But beyond that, they said, no, here are their, their scorecards. They all scored 95, and we all, they know they, just for example, they scored 50, but they made it 95. Isn't that the, the, it goes to Judge Mott's question to you, isn't that perhaps the problem that maybe the garden variety is just, it serves, they're just wrong people doing it, as opposed to the people doing it, you're lying about their proficiency on a score. Is that a difference, or what do you think? It goes to Scienter. And that's what the court in Triple Canopy says. The issue of their falsification of the records, as you correctly pointed out, went to the, the, whether or not the defendant had the knowledge that what they were doing was wrong. In that case, that the, the court used that as, as a basis to find Scienter. But hearken back that this requirement. And they had to specially plead under the rules, but you don't have to do that because you're a step removed. That's right. All we're required is to place them on, on notice, which, which in the complaint we did. We used her, we, we used the, described in the complaint itself at paragraph 48. Our client said to the highest person in country, what is happening here is fraud on the government. This is illegal. It is going to create liability for the company. So it might not be enough for a straight false claims act case, but because it's a retaliation case, it is enough. We can see that it would not meet a 9B standard for pleading, but under the 8A standard, which this court in Elms. The standard would be applicable if it was a straight false claims act case rather than a retaliation case. In a retaliation case, we simply have an 8A standard to place the defendant on notice. And important, remember that the, that in addition to this distinct possibility prong, we now have a law that has a brand new provision. This brand new provision was meant to expand the scope of protected activity. And this is the provision that describes where an individual engages in conduct and furtherance of a false claim, or again in the disjunctive, an effort to stop one or more violation, that that is enough. And courts in interpreting that, indeed, looking at the- Maybe you can finish your sentence, or answer Judge Gregory's question. I just want to, just, lead judgment and very kind, so we'll be very quick here. Just this, the nature of it, really, your client assesses, I'm not arguing correctly or incorrectly, the deficiencies of these other people, like you said, they didn't go to college, high school people, not know what they're doing in surgical situations. But it's interesting, and this is in a retaliation and employment situations. Title VII cases, we don't allow people to tout their own abilities and assess how good they are as employees. Kind of strange we allow people to assess other people's job performance. Isn't that what we're doing here? Your client is saying, these people don't know what they're doing. They're not protocols, or, I mean, can you comment on that? It's not an issue about malpractice. It's an issue about objective criteria. They didn't have the certification in, for an operating room. It's just like when you go to, if you have surgery, you want to make sure there's a doctor there. That it's not somebody who is an EMT. Well, I think if you're on the front lines, you'd rather have a nurse than no nurse. And that may have been the choice. But we're not there yet. We're not deciding the merits yet. And you're hanging your hat all on this one requirement, trying to line yourself up with triple canopy, which is entirely, you know, that's the way we litigate these things. It is, but I'll see. So it's, they promised under the contract that they would put somebody in that was an operating room nurse. Yes. And they didn't do that. Not just an operating room nurse, but certified operating room nurse, which requires this training. Again, it's important. You need to know what surgical tools. When the surgeon says, please hand me a number eight scalpel, that you're not handed a tong or something else. This is what's going on here, that it's sterilized properly. Sterilization is an important component in teaching of operating room scrub techs. That, the individuals that were supplied had no training in that at all. This was life and death, just as it was in triple canopy. I'll reserve the remaining time. You don't have the remaining time. I would like you to, during your argument, sometime engage in triple canopy in a way that I'm not really sure you have yet. Because it seems to me it did sort of change the ground in the fourth circuit. I'm happy to do that. I noticed that my clock says 20 minutes, and I asked for 15. And I'm wondering if maybe I've stolen some of his time inadvertently. No, you haven't stolen any of his time. And of course, I'll stay as long as you want me to. But I'm Jay Train, and represent CHS, Your Honor, and Judge Mott. You don't have to take 15 if you don't want to. You don't have to take any. You're encouraging me to, based on the trial court's decision, maybe I should just sit down. I appreciate Your Honor asking about the triple canopy case. I don't think that is a case that goes against what the trial court's decision was in this particular case. Particularly, Your Honor pointed out that fourth footnote. And Judge Gregory, I think you asked about, aren't we saying in this case that we're asking these people, we're allowing the youngs to comment on how other people do their job. And I think that the footnote in triple canopy spoke to that directly when the court wrote, in addition, this is not a case involving subjective interpretations of vague contractual language. And what we have here with the youngs is exactly that. These are subjective interpretations that the folks in that ER or the OR suite could not do their job. That's a subjective interpretation. And there's nowhere in this record, Your Honors. Well, no, he's talking about an objective falsehood. I mean, let's just, the contract called for them to be certified in this manner, and they weren't. That's the falsehood. It doesn't matter whether they can do the job. I'm inclined to think, as I say, that I'd rather have some kind of nurse if I was on the front lines than no nurse at all if that was the choice, whether certified or not. But that's not what you're arguing to us right now. We're talking about whether their statement or the contract requirement that they have people that were certified nurses for the operating room was true or not. Well, the actual provision of the contract is much broader than that. Okay. It states that the record, page 99, ensure that health care providers are properly trained and certified prior to arrival in theater and that they stay proficient while providing health care. It doesn't speak to specific nurses. It doesn't speak to specific technicians. It doesn't get into specifics at all. And frankly, there's nowhere in this record, Your Honor, that there was ever a report of inappropriate or staffing like you had in the Triple Canopy case. What do you mean there's nowhere? What about all these things these plaintiffs said to them? Maybe they're nitpickers. Maybe they're just troublemakers. But what do you mean there are no reports? I think counsel stated that the CHS, my client, was reporting to the state certain improper staffing levels. And that just doesn't exist in the record. I agree with you, Your Honor, that the youngs were- The plaintiffs were certainly making themselves felt here. They did. And if Your Honor is probably familiar with the record, they contacted the government not to report that you have people in the OR who don't know what they're doing. What they were reporting was substandard care. The youngs were called one- And the fellow's name was Mark Cohen with the government state department. And they said, I want to report substandard care, which is medical malpractice. That was the one report made according to the second amended complaint to the government. So there was never any report like you had in Triple Canopy where you had the supervisor- I see what you're saying. The entity is not making false reports as Judge Gregory was discussing with your colleague. Yes, Your Honor, which I think is another distinction with Triple Canopy. So reading the footnote and the language saying that these people will be trained with certificates in-country and remain so, correct? That's roughly what the language says. Yes, Your Honor. I agree. So you're saying one is vague because it doesn't say what positions, what persons. Were there any persons not certified in anything in that medical realm? I'm giving double negatives, but I mean, did everyone have some kind of certification? The problem, I mean, I'd like to answer that question, but the record we have is really, really thin at this point. We don't know. This is a Sather Air Force Base where, according to the first amended complaint, they do one to three surgeries per month. And our relators here, the Youngs, were only there for about eight weeks. They referenced a couple patients that came in who were defense contractors, State Department contractors, who didn't get the kind of care they wanted, that they felt they should get. There's no specific allegation at all that the folks operating on these, excuse me, patient one and patient two, the doctor wasn't certified or anything like that. It's more of a very general, more garden variety complaint that, hey, an EMT is in the OR acting as a scrub. I think that, as Mr. Young said in one of the paragraphs of the complaint, you know, all startup contracts are going to have problems. And that's what we had here, is we had a startup contract that had some issues, maybe had some minor disagreements, some minor oversight. Well, I understand your distinction of oh-my-bad to be that the entity in that case was the one that asserted falsely that the employees were qualified, and here that's not the case? Yes, Your Honor, absolutely. So in that case, had it been that there was one of the employees asserted that these employees are not qualified, and in fact it showed it were not qualified, but the entity had never said anything, then the outcome would be different. I don't believe so, Your Honor. I mean, how is that different from here? If you have a contract to say that you are going to have medical service providers who are trained and you have persons who are trained, they're not doing this, I don't think, maliciously, but they're trained, and it says you have people here who are just not qualified as medical providers, and this is at the motion to dismiss stage. We're taking this as true. How is that different from oh-my-bad, if the lying is not the central issue? Because in Omar Bader, you had the objective test, the specificity of you need to shoot straight, you need to hit this target 23... That goes to SANTOR, and the requirement under the rule that you had to plead with particularity. You don't have that here. I agree. So you're right, that's a difference, and if you did have a straight-up False Claims Act claim, I think it would be a distinction, but you don't here. You have this retaliation for, I mean, frankly, a claim I'm not too familiar with, but a retaliation for a possibility that you might, but you didn't, file a False Claims Act. And I think maybe that is why Judge Lee allowed them to come back again and amend the complaint. It's totally understandable why Judge Lee did what he did, but he's also the judge in Triple Canopy. And, you know, Triple Canopy's been out, what, hot off the press, been out three weeks. January 8th, I think it was. But I think in Triple Canopy, Judge, you're familiar with that case, that he... They're intimately familiar. Intimately familiar, right? He focused, I guess, maybe to a fault, on the actual billing, the invoice itself. The invoice didn't say, we are billing you, government, for the Ugandan guards who can score 25 out of 30. The invoice didn't say that. And the judge said, well, because it didn't say that, this isn't a False Claim Act case. This court, looking at it and employing common sense, and that phrase is used in that opinion, and I think it ought to be used here. You look at what went on there with that requirement that you hit the target 25 out of 30 times. You got the folks that came back and said, well, none of them got it, so we're going to falsify the records, and we're going to put those records in the files, and then when we need replacement guards, they come over from Uganda, they can't make the marksmanship requirement, we're going to falsify those records. What I think is different... The falsification of the records is one aspect of the case, but it is the fact that the guards in that case were not qualified. Right. Even without the records being falsified, that's false, falsity in and of itself. And because you're putting people that can't shoot, who are just unqualified, and it's just an untenable situation to be in. And how is that different than putting unqualified medical folks in charge of surgeries and providing medical? I mean, if that's the... And then 12b-6, I'm taking it as true, that if it's true that your contract requires that you have people who are trained in medical abilities, and they say you don't, then is that not sufficient for 12b-6? I think, as you phrased it, it would be, but I don't think that's what we have here in this, either the First Amendment complaint or the Second Amendment complaint. What we have here is a statement that all health care providers will be certified prior to arrival in theater, and they stay proficient. Excuse me. And these folks have said, well, in this surgery suite, we've seen EMTs. That's all there is to go on. And I don't think even under a liberal pleading requirement like 8, that that's sufficient. Because there's no allegation that we're getting paid for less or more money the way that they were in Triple Canada. But that's going to be knowledge which is in your control that they have no way of knowing. Agree with you, Your Honor. And so when you have that kind of case, you know, sort of as a matter of ordinary pleading, we don't require the plaintiff to plead it. I mean, if it's knowledge that's only going to come out in discovery, maybe you're going to have a document that says it's not essential to this contract that these people be certified for operating room. You could have that. Or we're going to let you have five weeks or six weeks to get things in order. We're not going to hold you to the exact terms of the contract. Maybe you have that. Right. But there's no way for them to know that now. Right. But in the Triple Canopy case, the relator certainly knew that there was a 12-month period where these invoices were being sent. It was a lot more known then. Right. And in our case, Your Honor, we do have to have the nexus between what you're saying is the complaint and the fraudulent conduct. And then we, CHS, have to be put on notice that they're either pursuing a distinct possibility of litigation or there's a reasonable belief. And that, what the trial court says, just doesn't exist in this case. So there's no protected activity, no matter what standard we use. And frankly, I think I've put in my brief enough that under either standard, whether we look at the distinct possibility. Because if you look at their appellate's brief here in this court, Your Honor, they ask that the standard be changed to reasonable belief. I think it's clear from the district court's hearings in this case and his opinions that he considered both standards. And under neither one could this complaint, the First Amendment complaint, the Second Amendment complaint, pass muster under either standard. And it was appropriately dismissed. And I would say, Your Honors, that the differences that we have, and I know, I acknowledge the triple canopy is the 9B standard. But that is the type of conduct that the False Claim Act goes to, is the unscrupulous contractors. There's no even allegation that what CHS was doing was unscrupulous, was trying to take government money to steal from the public fisc. That just doesn't exist in either complaint, Your Honors. At most, it would be garden variety complaints about medical care. It would be startup problems with the contract. It would be growing pains, minor oversights to allow this type of retaliation claim to go forward, based on what little's in this complaint, would really open up all kinds of employee complaints to a False Claim Act. And that's just not what that act intended. Your Honors, since I, unless there's any questions, I'll turn it over to my colleague. Thank you very much. Thank you very much. Let me ask one last question. Yes, not so fast, I should say. When Congress amended that statute in 2009, did it dispense with the distinct possibility litigation test? I don't think so, Your Honor. It did not. What it did is it afforded more protection for the relators. It provided that you don't simply have to be acting in furtherance of a possible key tam action. You could be taking steps, one or more steps, to protect something under this statute. But it still has to be fraudulent conduct. So no, I don't think Congress intended to do away with that standard at all. And frankly, no court has. I mean, it's still there. It's still operating. And the court in this case, Judge Lee, I thought did a fine job of taking that standard into account, as well as the reasonable belief standard. Was there a second protected act added to the statute, do you think? There was a, it just expanded, I think, the protections. So folks like counsel's clients don't have to be acting in furtherance of an action. They could just be acting to take steps to prevent one or more violations under this act. So it really broadened their protection. But it didn't do away with how courts are going to look at whether they've engaged in protected activity. And that's where the standard gets in. So you rate the actions as being all the same, not creation of two protected acts? Right. One more broad than the other. Yes, Your Honor. Thank you very much. I just want to address your question first, which is the state of the law prior to the amendments. The state of the law prior to the amendments is very clearly set out in the Mann case, which the court in its footnote indicated was pre-FERA. And it says the following, when the sole question relates to an employee's protected activity, we apply the distinct possibility standard from the perspective of the facts known by the employee at the time of the protected conduct. It doesn't have to be right. It just has to be a good faith, reasonable belief. That was the standard before the amendments to the act in 2009. This is the Mann case at page 344 and 345. As to your question about the effort to stop one or more violation that was added to the act, this was dealt with in our brief. The important part here is the House report, which talks about the purpose of this. It says the following. This is a page in our brief. Unfortunately, since the 86 amendments were enacted, several court decisions have limited the reach of the False Claims Act, jeopardizing billions of federal funds. Since the 86 amendments, courts have limited the scope of the False Claims Act anti-retaliation provisions. Congress stated that the language is intended to make clear that 3738 protects not only steps taken in furtherance of a potential or actual key tam action, but also taken to remedy misconduct through methods such as internal reporting to a supervisor or company compliance department. The point here is that Congress wanted to give individuals the broadest protection for raising these at the earliest possible moment at the lowest possible level. And that is precisely what the Youngs did here. What they did was they started with their initial supervisor, then they went to the highest level person in country, telling her what was happening was fraud on the government, saying it was illegal and opening the company up to liability. Staying the reports that were sent to the State Department were false. So they're tying all of that together. Then they even go further. An external report is not required under the False Claims Act, but they did. They went to the State Department and they complained to the State Department. This all, by the way, is happening over a period of less than 30 days. And then they're fired and sent out of country. So you would have us to hold that this act dispensed with this distinct possibility litigation test? Yes, because the purpose of the distinct possibility standard was put into the in furtherance of in order to meet the second requirement that Eberhardt said, which is knowledge by the employer. The employer needed to know that litigation was a distinct possibility. What the act, efforts to stop one or more false claims, does is it merges those two. And this is the Lehman case at page number 1479, and citing a case, Manfield v. Altung International Solutions, cited in our brief, 851 F sub second 196 of 204. Here's what it says. Nonetheless, the District Court for the District of Maine has held, since the plaintiff, under this new standard, engages in protective conduct whenever he engages in an effort to stop an FCA violation, the act of internal reporting itself suffices as both the effort to stop the FCA violation and notice to the employer. So under the effort to stop one or more false claims, these two requirements now have been merged. Again, the point here is that we want to encourage individuals to raise these claims at the earliest possible moment. Why? So that corporations can fix these problems. If, let's say it's a false claim, they know about it, but it's a rogue employee that's engaging in the false claims, the Employee Compliance Department can then intervene and stop this. One does not need to go further. One does not need to show or to claim that a violation of the FCA, the False Claims Act, will lead to a distinct possibility of litigation. So here, we contend not only, of course, that we meet that standard, but we even meet the higher distinct possibility standard because of the language that the Youngs used in their reports to internal personnel, using liability to the company, fraud. These are exactly the terms that Eberhardt teaches us are the kinds of terms under the old standard that an employee should use in order to trigger the protections of the employee protection provisions of Section 3738 to the False Claims Act. You can't just very well do that. That means that would put this totally in your control. You could call anything, no matter how spurious and speculative or vague the requirements are, that's fraud. And they knew I was calling it fraud. Therefore, that makes me protected. No, it doesn't. Reasonable belief is an objective standard. Do you agree? Oh, it is. And we're not, there is absolutely a reasonable good faith belief that's required. Right. And so, even though you don't have to make out a 9B claim, you do have to say that they're doing something that would be similar to a Ketam-type engagement in fraud, right? Well, you do have to indicate that there is some kind of false statement, that there is, which they did. They stated that there were misrepresentations to the Department of State that related to the qualifications of surgical techs, that they had this certification when, in fact, the individuals that the company put into the operating room did not. That is an objective criteria identifying precisely where the falsity is, indicating that the employee staffing report's going to the State Department, tying it directly to the contract, tying it directly to something that goes to the State Department on which the State Department relies. So, in this case, the Youngs did exactly what Your Honor has said that you would expect. They did, they put the highest person in the country on notice that this is what was happening. And they said they think it opens up the company to liability. They think it's fraud on the United States. They think that it's illegal under the contract. Those are the terms they used. And the question then becomes, is it reasonable under the circumstances and from their perspective as nurses understanding that these requirements, these certification requirements are required in the operating room? Why is it you're not handing me the right scalpel, the right tool? Why is it that we're not being sanitized properly? To notify that the contractor, that the contractor was not supplying the individuals with this kind of experience is exactly what the law would expect individuals to do. And that's precisely what the Youngs did in this case. Thank you very much. We will come down and greet the lawyers and then go directly to our last case. Thank you.
judges: Diana Gribbon Motz, Roger L. Gregory, James A. Wynn, Jr.